# In the United States Court of Federal Claims

No. 20-1535

(Filed:  19 October 2021)

```
*****************************************
SAM RAYBURN MUNICIPAL POWER          *
AGENCY,                              *
                                     *
             Plaintiff,              *   RCFC 12(b)(1); Subject-Matter Jurisdiction;
                                     *   RCFC 12(b)(6); Failure to State a Claim;
v.                                   *   Motion to Dismiss; Breach of Contract;
                                     *   Monetary Damages; Remedy
THE UNITED STATES,                   *
                                     *
             Defendant.              *
                                     *
*****************************************
```

*Neil H. Koslowe*, with whom was *Michael J. Rustom*, Potomac Law Group, PLLC, both of Washington, D.C., for plaintiff.

*Kelly A. Krystyniak*, Trial Attorney, with whom were *Brian M. Boynton*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Elizabeth M. Hosford*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, *John D. Bremer*, General Counsel, Southwestern Power Administration, U.S. Department of Energy, and *Katharine S. Talbot*, Assistant District Counsel, U.S. Army Corps of Engineers, all of Washington, D.C., for defendant.

## OPINION AND ORDER

**HOLTE**, **Judge**.

Plaintiff, Sam Rayburn Municipal Power Agency, filed an amended complaint alleging breach of contract and requesting monetary damages.  The government moved to dismiss plaintiff's claims under Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC").  For the following reasons, the Court **DENIES** the government's motion to dismiss.

## I. Factual and Procedural History

### A. Factual History[1]

The Flood Control Act of 1944 authorizes the United States Department of Energy, through its Power Marketing Administrations, "to sell energy produced at hydropower facilities operated by the United States Army Corps of Engineers" ("the Army" or "the Corps").  Def.'s Mot. to Dismiss Am. Compl. ("Def.'s MTD") at 2, ECF No. 13 (citing 16 U.S.C. § 825s; 42 U.S.C. § 7152).  The Southwestern Power Administration ("SWPA" or "the government") "is one of four 'Power Marketing Administrations' within the Department of Energy, responsible for marketing federally-generated hydroelectric power."  *Id.* at 3 (citing 42 U.S.C. § 7152).  "By law, power owned by [SWPA] is marketed and delivered primarily to public bodies, such as rural electric cooperatives and municipal utilities, known as 'preference' customers."  *Id.* (citing 16 U.S.C. § 825s).  The Sam Rayburn Municipal Power Agency ("plaintiff" or "Sam Rayburn"), "as a preference customer, is 'entitled to a preference in the sale and disposition of power and energy by [SWPA], and, following a public notice and participation process' was 'selected to receive the power and energy produced at [the Town Bluff Hydropower Project].'"  *Id.* (quoting Contract No. DE-PM75-85SW00117 ("Contract"[2]) at 2, ECF No. 13-1).

On 28 June 1985, the government, "acting by and through the Commander, Fort Worth District of the Corps, and . . . the Administrator of SWPA, executed a first-of-its-kind Construction Agreement for the Town Bluff Hydropower Project" ("the Project") with plaintiff.  Am. Compl. at 3, ECF No. 6.  Plaintiff "agreed to pay 100% of the total construction costs for [the Project], and the Corps agreed to construct and then operate the Town Bluff Dam, including the hydropower generating facilities resulting from the construction of that Project."  *Id.*  Also on 28 June 1985, the government, "acting by and through the Administrator of SWPA, executed 'Contract No. DE-PM75-85SW00117,' entitled 'Power Sales Contract Between United States of America and Sam Rayburn Municipal Power Agency' . . . ."  *Id.*; *see also* Def.'s MTD at 2 ("[Plaintiff] entered into Contract No. DE-PM75-855W00117 [sic] with the Government . . . .").

In 1989, plaintiff "entered into an agreement with the Sam Rayburn Generation and Transmission Cooperative ('SRG&T') by which [Sam Rayburn] agreed to an allocation of 68.06% of the electric power and energy produced by [the Project] and SRG&T agreed to an allocation of 24.89% of that electric power and energy."  Am. Compl. at 8.  "The remaining 7.05% of the electric power and energy was allocated to the Vinton (Louisiana) Public Power Authority," which is not party to the suit.  *Id.*  Plaintiff, however, "is contractually responsible to pay for 100% of SWPA's billings for the power and energy i[t] delivers to these three power purchasers."  *Id.* at 9.

---

[1] For the government's motion to dismiss, the Court "accept[s] as true all undisputed facts asserted in the plaintiff's [amended] complaint."  *Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016) (quoting *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011)) (internal quotation marks omitted).  *See also Athey v. United States*, 908 F.3d 696, 705 (Fed. Cir. 2018) (quoting *Bell/Heery v. United States*, 739 F.3d 1324, 1330 (Fed. Cir. 2014)) (holding for RCFC 12(b)(6) motions, the Court "must accept well-pleaded factual allegations as true").

[2] While the parties dispute whether the document is a contract or a cooperative agreement, the Court's use of the term "contract" in this opinion reflects only the document's name for itself and is not a legal finding.

The Contract provides:  "SWPA shall sell and deliver and [Sam Rayburn] shall purchase and receive, or cause to be received, all of the electric power . . . and energy . . . generated at the Project which is made available to SWPA . . . ."  Contract at 4; Am. Compl. at 4; Def.'s MTD at 2, 12; *see also* Def.'s Reply in Supp. of Mot. to Dismiss Am. Compl. ("Def.'s Reply") at 4, ECF No. 15).  Regarding compensation, the Contract says:

> [Sam Rayburn] shall compensate SWPA each month for Hydro Power and Energy purchased under this Contract at the rates and under the terms and conditions set forth in the rate schedule . . . .  It is understood and agreed that said rates are to be isolated project rates and are only intended to recover all operating, maintenance, addition, replacement, marketing, and concomitant interest expenses associated with the Project and with this Contract and not intended to recover (through amortization, depreciation, or any other means) any Project construction costs . . . .  [F]ollowing start of deliveries under this Contract, such rates shall be applicable regardless of the quantity of Hydro Power and Energy available or delivered to [Sam Rayburn]; Provided, however, That if an Uncontrollable Force prevents utilization of both of the Project's power generating units for the purposes of this Contract for an entire billing period, and if during such billing period water releases were being made which otherwise would have been used to generate Hydro Power and Energy, then SWPA shall, upon request by [Sam Rayburn], suspend billing for subsequent billing periods, until such time as at least one of the Project's generating units is again available for the purposes of this Contract.

Contract at 5–6; *see* Am. Compl. at 5–6; Def.'s MTD at 4–5, 12; Def.'s Reply at 5.  The Contract defines an "Uncontrollable Force" as:

> any force which is not within the control of the party affected, including, but not limited to failure of water supply, failure of facilities, flood, earthquake, storm, lightning, fire, epidemic, war, riot, civil disturbance, labor disturbance, sabotage, or restraint by court of general jurisdiction, which by exercise of due diligence and foresight such party could not reasonably have been expected to avoid.

Contract at 4; *see* Am. Compl. at 5; Def.'s MTD 5 n.5; Pl.'s Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Resp.") at 16 n.63, ECF No. 14; Def.'s Reply at 6, 10.  Regarding payment to SWPA, the Contract says:

> If [Sam Rayburn] fails to pay any amount due under this Contract, SWPA may, at its option, cause the delivery of power and energy under this Contract to be discontinued upon 90 days' prior written notice to [Sam Rayburn], unless payment of the amount due is made by [Sam Rayburn] within such 90-day period.  Such discontinuance of the delivery of power and energy, as herein provided, shall not relieve [Sam Rayburn] of liability for the SWPA rate schedule charges during the period of such discontinuance, and the rights granted SWPA herein shall be in addition to all other remedies available to SWPA, either at law or in equity, for the breach of any of the provisions of this Contract.

-3-

Contract at 11; *see* Def.'s MTD at 10; Pl.'s Resp. at 17–18; Def.'s Reply at 7–8.  The Contract further provides:

> Hydro Power and Energy shall be delivered by SWPA as scheduled except for interruptions or curtailments in delivery caused by an Uncontrollable Force, or by the operations of devices installed for system protection, or by the necessary installation, maintenance, repair, and replacement of equipment.  Such interruptions or reductions in service, as hereinbefore set forth, shall not constitute a breach of this Contract, and neither party shall be liable to the other for damages resulting therefrom.  Except in case of an emergency, SWPA shall give [Sam Rayburn] reasonable advance notice of temporary interruptions or curtailments in service necessary for such installation, maintenance, repair, and replacement of equipment, and shall schedule such interruptions or curtailments so as to cause the least inconvenience to [Sam Rayburn].

Contract at 15; *see* Am. Compl. at 5; Def.'s MTD at 5, 9, 11, 15; Pl.'s Resp. at 16, 22; Def.'s Reply at 6, 7, 10–11.  The Contract also contains a provision regarding termination for breach:

> If either party hereto breaches a material provision of this Contract and such breach shall be continuing, the other party, at its option, may terminate this Contract upon 30 days' prior written notice of its intention to do so, and this Contract ipso facto shall terminate at the end of such 30-day period unless within that period such period is extended by mutual agreement or unless such violation is corrected.  Neither party hereto, however, shall be considered to be in default or breach with respect to any obligation under this Contract if prevented from fulfilling such obligation by reason of an Uncontrollable Force.

Contract at 20; *see* Am. Compl. at 7–8; Def.'s MTD at 5–6, 10–11, 15; Pl.'s Resp. at 17–18; Def.'s Reply at 7 n.4, 8.

Plaintiff alleges:  "By the year 2006, the two generator units at [the Project] began to fail frequently.  In November 2015, both units were put out of service as a result of the failures."  Am. Compl. at 9.  "From December 2015 through April 2017, the two generator units at [the Project] did not produce any electric power or energy, and SWPA did not deliver any electric power or energy during this 17-month period to [Sam Rayburn] . . . ."  *Id.*  Nonetheless, "SWPA continue[d] to bill [Sam Rayburn] at its regular rates and [Sam Rayburn] continued to pay those bills in full.  During this 17-month period, [Sam Rayburn] paid SWPA a total of $1,758,446.90."  *Id.*

In November of 2016, plaintiff and SRG&T "informally raised with the Corps severe reliability and quality of service issues regarding [the Project] that called into question its continuing economic viability."  *Id.*  In a 13 February 2017 letter, plaintiff and SRG&T "formally requested and urged the Corps, as the service agent for SWPA, to evaluate, in an expeditious manner, the appropriate disposition of [the Project], including de-commissioning options[,] . . . sent a copy of the request to SWPA[,] and asked for a final decision on that disposition within 120 days."  *Id.* at 9–10.

The Corps and SWPA issued a "final White Paper dated March 24, 2017, [in which] a 'Project Delivery Team' consisting of representatives of SWPA and the Corps identified a long list of problems" at the Project.  Am. Compl. at 10.  Those problems included the following:

(1) a failed station service transformer;

(2) a faulty fixed-mounted emergency diesel generator;

(3) unit control system programmable logic controllers whose software did not run on modern operating systems and whose parts were almost impossible to find;

(4) increasingly unreliable and worn governors which required non-standard parts because of the unavailability of replacement parts;

(5) a [supervisory control and data acquisition] system comprised of equipment of different vintages which had numerous hardware failures;

(6) communications equipment near the end of its life which could not be expanded;

(7) unit exciters which experienced numerous failures and for which replacement parts were scarce;

(8) bushings for the wicket gates which must be replaced and whose seals had failed, allowing water leaks; and

(9) bearings that had worn to a point that the governor system had to operate at a level much higher than appropriate.

*Id.* at 10–11.  The White Paper concluded, "as a consequence of these problems, the availability of the two generator units at [the Project] during the period 2012 to 2017 was less than 25%." *Id.* at 11.

The White Paper outlined "five alternative options for dealing with the severe problems at [the Project]."  Am. Compl. at 11.  The only option that would allow the government to maintain its existing relationship with plaintiff "called for capital replacement and rehabilitation work that would cost an estimated $6,577,000." *Id.*  "SWPA and the Corps noted that $5,500,000 of that amount was available from 'customer funding.'" *Id.*  The government told plaintiff, "the '[m]ajority of the repairs are estimated to be completed in 2020,' and that those repairs would" fix the Project. *Id.*

Plaintiff alleges, "none of the capital replacement and rehabilitation work at [the Project] recommended in the 2017 White Paper by SWPA and the Corps was performed, except for some minor engineering studies."  Am. Compl. at 11.  "Nevertheless, from 2017 to date, the rate SWPA billed [Sam Rayburn] included the amortized cost of the $5,500,000 funding provided to the Corps by SWPA preference customers, and [Sam Rayburn] paid that amortized cost." *Id.* at 11–12.

Plaintiff further alleges the plant "produced no electric power or energy from January 2019 through August 2020 . . . ." *Id.* at 12.  "[D]uring this 20-month period SWPA billed [Sam Rayburn] and [Sam Rayburn] paid SWPA a total of $2,138,060." *Id.*  At oral argument the

parties discussed their disagreement as to the current operational status of the plant.[3]  Transcript of Oral Argument on 19 May 2021 ("Tr.") at 16:5–23, ECF No. 22.  Plaintiff alleges the plant is not operational and has been sitting idle for 41 months.  Tr. at 52:16–19 ("We're not talking about an interruption caused by a raccoon for a couple of weeks or even a couple of months. We're talking about forty-one months.  That's three years of no service.").  At oral argument, the government conceded "there are currently significant operational problems with the plant" and— at the time of oral argument—the plant was sitting idle.  Tr. at 15:3–17. The parties agree the plant was not under repair at the time of oral argument but disputed the reason for the delay in repairs.[4]  Tr. at 16:24–18:19.  The government concedes it has a duty to make repairs under the Contract.  Tr. at 18:20–25 ("COURT:  So under the [Contract] . . . who [has] the duty to conduct the repairs?  [GOVERNMENT]:  The [Contract] shifts the duty for the operation and maintenance of the plant to the [g]overnment.").

Plaintiff requests money damages as claimed in three counts:  (1) breach of contract for failure to deliver power and energy; (2) breach of contract for failure to maintain and repair the Project; and (3) breach of implied covenant of good faith and fair dealing.  *See* Am. Compl. at 12–15.

### 1.  Plaintiff's Claim for Breach of Contract for Failure to Deliver Power and Energy

The first count of plaintiff's amended complaint alleges breach of contract to deliver power and energy.  *Id.* at 12–13.  Plaintiff argues, "[b]y failing to deliver any Hydro power or energy to [Sam Rayburn] . . . during the 17-month period from December 2015 through April 2017 and during the 20-month period from January 2019 through August 2020, the United States breached material provisions of the [Contract] and caused significant money losses to [Sam Rayburn]."  *Id.* at 13.  Plaintiff requests at least $3,896,506.90 in damages under this count.  *Id.*

### 2.  Plaintiff's Claim for Breach of Contract for Failure to Maintain and Repair the Facilities

The second count of plaintiff's amended complaint alleges breach of contract for failure to maintain and repair the project.  Am. Compl. at 13–14.  Plaintiff argues the government "failed properly to maintain and repair [the Project] facilities, and to perform the needed capital replacement and rehabilitation work at those facilities, in breach of material provisions of the [Contract]."  *Id.* at 13.  Plaintiff argues the government "shifted the burden of maintaining [the

---

[3] "[GOVERNMENT]:  [A]t the time that this complaint was filed, the plant was not producing energy due to repairs that had to be made.  However, I know that as of the February time frame it was back online.  As far as its status today, I do not know.  [SAM RAYBURN]:  Your Honor, if I may . . . [the two units at the plant] are both offline now.  Neither was working.  Neither is producing anything.  The last production in May was 8 megawatts.  That's 0.33 percent of the capacity.  That's less than 1 percent of the capacity.  So right now it's totally inoperative.  As I said, it fell apart.  COURT:  . . . I assume agency counsel agrees with that number or has no reason to dispute it? [GOVERNMENT]:  I have no reason to dispute it."  Tr. at 16:7-23.
[4] The parties agreed $5 million dollars is held in trust for the government to make repairs to the plant.  Tr. at 17:4–18:14.  The government states—per Sam Rayburn's request—the repairs are pending a decision regarding whether the plant should be decommissioned, Tr. at 17:4–11, while Sam Rayburn states repairs were supposed to begin in 2017, Tr. at 17:18–18:6.

Project] in good working order from the United States to [Sam Rayburn]." *Id.* at 14.  Plaintiff requests at least "some proportion of $8,553,333.10" in damages under this count.  *Id.*

### 3.  Plaintiff's Claim for Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiff's third count alleges breach of implied covenant of good faith and fair dealing. Am. Compl. at 14–15.  Plaintiff argues, "[a] covenant of good faith and fair dealing is implied in the [Contract]." *Id.* at 14.  Plaintiff argues the government breached this covenant "[b]y failing to deliver any Hydro power or energy to [Sam Rayburn]" during the above-stated periods "and by failing properly to operate, maintain, repair, replace, and rehabilitate the facilities at [the Project] in a manner that would enable SWPA to meet its obligations under the [Contract] and that would comply with the accepted standards of reliability and adequacy in the electric utility industry . . . ." *Id.* at 14–15.  Plaintiff requests at least "$3,896,506.90 plus some proportion of $8,553,333.10" in damages under this count.  *Id.* at 15.

### B.  Procedural History

Plaintiff filed its complaint on 6 November 2020 and its amended complaint on 2 December 2020.  *See* Compl., ECF No. 1; Am. Compl.  On 23 December 2020, the government requested an extension of time until 8 March 2021 to file its answer to the amended complaint. *See* Def.'s Mot. for an Enlargement of Time in Which to Respond to Pl.'s Compl., ECF No. 7. On 7 January 2021, the Court scheduled a status conference for 25 January 2021.  *See* Order, ECF No. 10.  Plaintiff filed a motion for partial summary judgment on 19 January 2021.  *See* Pl.'s Mot. for Partial Summ. J., ECF No. 11.  During the status conference, the government stated it planned to file a motion to dismiss; by the parties' agreement, the Court denied the government's motion for an extension of time as moot and stayed plaintiff's motion for partial summary judgment pending resolution of the government's motion to dismiss.  *See* Order, ECF No. 12.

On 1 March 2021, the government filed a motion to dismiss all three of plaintiff's counts under RCFC 12(b)(1) and plaintiff's first count under RCFC 12(b)(6).  *See* Def.'s MTD.  On 15 March 2021, plaintiff filed its response to the government's motion to dismiss.  *See* Pl.'s Resp. The government filed its reply on 22 March 2021.[5]  *See* Def.'s Reply.

On 19 May 2021, the Court held oral argument on the government's motion to dismiss. *See* Order, ECF No. 18.  At oral argument, the parties stated they were not prepared to discuss the Federal Circuit's decision in *Boaz Housing Authority v. United States*, 994 F.3d 1359 (Fed. Cir. 2021)—a precedential case issued 16 April 2021 reviewing issues relevant to the government's motion to dismiss.  Tr. at 46:3–20.  The parties further did not address certain

---

[5] Plaintiff also filed a motion for leave to file supplemental opposition to the government's motion to dismiss.  *See* Pl.'s Mot. for Leave to File Suppl. Opp'n to Def.'s Mot. to Dismiss, ECF No. 16.  The government filed a response "tak[ing] no position on the motion."  Def.'s Resp. to Pl.'s Mot. Seeking Leave to File "Suppl. Opp'n" at 1, ECF No. 17.  At oral argument, the government clarified it "do[es] not oppose the filing of that brief."  Tr. at 6:17–24. Accordingly, for good cause shown, the Court grants plaintiff's motion for leave to file supplemental opposition to the government's motion to dismiss.

relevant provisions of the Contract in their briefing and were not adequately prepared to discuss them at oral argument. Tr. at 38:16–45:17. Accordingly, following oral argument, the Court ordered supplemental briefing addressing: (1) the Federal Circuit's decision in *Boaz*; and (2) any relevant portions of the Contract the parties were not prepared to discuss. *See* Order, ECF No. 20. On 1 June 2021, the government filed its supplemental brief, see Def.'s Suppl. Br., ECF No. 23, and the plaintiff filed its supplemental brief the next day, see Pl.'s Suppl. Br., ECF No. 24.

## II. Applicable Law

### A. Subject-Matter Jurisdiction

A party may move to dismiss a complaint for lack of subject-matter jurisdiction under RCFC 12(b)(1). Plaintiffs "bear the burden of establishing the court's jurisdiction by a preponderance of the evidence." *Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016) (citing *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011)). "In determining jurisdiction, a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Id.* (quoting *Trusted Integration*, 659 F.3d at 1163). "Allegations of subject matter jurisdiction, to suffice, must satisfy a relatively low standard" of merely "exceed[ing] a threshold that has been equated with such concepts as 'essentially fictitious,' 'wholly insubstantial,' 'obviously frivolous,' and 'obviously without merit.'" *Boeing Co. v. United States*, 968 F.3d 1371, 1383 (Fed. Cir. 2020) (quoting *Shapiro v. McManus*, 577 U.S. 39, 45–46 (2015)).

The Tucker Act vests this Court with "jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States"; however, the Tucker Act does not establish a substantive right enforceable against the United States for monetary damages. 28 U.S.C. § 1491(a)(1); *United States v. Mitchell*, 445 U.S. 535, 538 (1980). To invoke jurisdiction under the Tucker Act and thereby survive a 12(b)(1) motion to dismiss, plaintiff must prove a substantive source of law creates the right to recover monetary damages. *Hamlet v. United States*, 63 F.3d 1097, 1101 (Fed Cir. 1995) (citing *United States v. Testan*, 424 U.S. 392, 398 (1976)). The substantive source of law can be a money-mandating constitutional provision, statute, regulation, or an express or implied contract with the United States. *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1554 (Fed. Cir. 1994). In other words, "when a breach of contract claim is brought in the Court of Federal Claims under the Tucker Act, the plaintiff comes armed with the presumption that money damages are available, so that normally no further inquiry is required." *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011). The Federal Circuit has found an exception only in limited cases:

> where a contract expressly disavows money damages . . . where the breach alleged was of a confidentiality provision in an agreement defining the terms of an alternative dispute resolution process . . . where the agreement concerned a criminal defendant's release on bail . . . and where a special government cost-sharing agreement, rather than a procurement or sales contract, was at issue . . . .

*Rocky Mountain Helium, LLC v. United States*, 841 F.3d 1320, 1327 (Fed. Cir. 2016) (first citing *Holmes*, 657 F.3d at 1314; then citing *Higbie v. United States*, 778 F.3d 990, 995 (Fed. Cir.

2015); then citing *Sanders v. United States*, 252 F.3d 1329, 1331 (Fed. Cir. 2001); and then citing *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1344–46 (Fed. Cir. 2008)).

### B. Facial Plausibility Requirement

Under RCFC 12(b)(6), a party may assert by motion the defense of failure to state a claim upon which relief can be granted. A defendant may seek dismissal of an action for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Facial plausibility requires plaintiff plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* When deciding a motion to dismiss under RCFC 12(b)(6), the Court "must accept well-pleaded factual allegations as true and must draw all reasonable inferences in favor of the claimant." *Athey v. United States*, 908 F.3d 696, 705 (Fed. Cir. 2018) (quoting *Bell/Heery v. United States*, 739 F.3d 1324, 1330 (Fed. Cir. 2014)). The Court, however, is "not required to accept the asserted legal conclusions." *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1380 (Fed. Cir. 2019) (citing *Iqbal*, 556 U.S. at 678).

### C. Breach of Contract

To state a claim for a government breach of contract, a plaintiff must plausibly allege the existence of a contract with the United States, which requires: "(1) mutuality of intent to contract; (2) offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States." *Hometown Fin., Inc. v. United States*, 409 F.3d 1360, 1364 (Fed. Cir. 2005). These requirements "are identical for both express and implied contracts." *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997). Plaintiff must also prove a breach of contract by showing "a failure to perform a contractual duty when it is due." *Id.* at 1325 (citations omitted).

## III. Parties' Arguments

### A. Subject-Matter Jurisdiction

#### 1. Presumption of Availability of Damages Under Government Contracts

During oral argument in this case, the Court asked, "[i]s it [p]laintiff's position now that a [Contract Disputes Act ("CDA")] claim does not apply" to which plaintiff admitted, "[y]es." Tr. at 66:5–10. Although plaintiff's claim is outside the CDA, the government admitted this Court can still exercise jurisdiction over this contract dispute "provided the agreement is money-mandating." Tr. at 66:15–22. The government's primary 12(b)(1) argument is the Contract is not money-mandating. Def.'s MTD at 6. The government argues the contract is akin to a

cooperative agreement and thus is "not presumed to provide money damages."[6]  Def.'s MTD at 11 (quoting *St. Bernard Par. Gov't v. United States*, 134 Fed. Cl. 730, 734 (2017), *aff'd on other grounds*, 916 F.3d 987 (Fed. Cir. 2019)).  The government contends the contract is "akin" to a cooperative agreement because "the 'princip[al] purpose' of the agreement is 'to transfer a thing of value' to [Sam Rayburn]—namely, all power produced at the project."[7]  Def.'s MTD at 6, 12 (first quoting 31 U.S.C. § 6305(1); and then citing Contract at 4).  The government further argues, "[t]he fees [paid by plaintiff to the government] thus serve only to compensate the Government for some portion of the costs of providing a Service" to plaintiff.  *Id.* at 12.  Additionally, the government argues the Contract "'carr[ies] out a public purpose of support or stimulation authorized by a law of the United States,' by fulfilling the Flood Control Act of 1944 . . . ."  *Id.* at 12–13 (first quoting 31 U.S.C. § 6305(1); then citing 16 U.S.C. § 825s; and then citing Contract at 2).  Thus, the government argues the nature of the Contract defeats the presumption that damages are available and thus the Contract is "outside this Court's subject matter jurisdiction."  *Id.* at 13 (citing *St. Bernard*, 134 Fed. Cl. 730).

In response, plaintiff argues the Contract is not a cooperative agreement because its "monthly payments totaling millions of dollars to the government . . . . indisputably constitute a 'benefit' to the government."  Pl.'s Resp. at 2.  Plaintiff further argues, "[t]he Power Contract was drafted with that title by the government, and it refers to itself as a contract *95 times*."  *Id.* at 19.  Plaintiff argues the Contract meets the Federal Circuit's standard for a contract because the recitations profess mutual intent, the government does not deny there was offer and acceptance, and the Contract was signed by an administrator with authority to bind the government.  *Id.*  Additionally, plaintiff argues the Contract is not a cooperative agreement because it is not a grant provided by the government to an eligible grantee as defined by federal regulation; plaintiff also argues the Contract was not executed as a cooperative agreement and has not been administered as one either.  *Id.* at 19–20 (citing 10 C.F.R. §§ 600.202, 600.210, 600.222, 600.226, 600.231).[8]  Finally, plaintiff states the government fails to distinguish this court's holding in *Anchorage v. United States*, 119 Fed. Cl. 709 (2015), which plaintiff argues "squarely rejected the identical 'cooperative agreement' argument the government makes here."  Am. Compl. at 20.  Plaintiff concludes, the Contract "is a money-mandating contract, not a cooperative agreement, and the Court has subject matter jurisdiction over it."  *Id.* at 21.

---

[6] In a heading of the government's motion to dismiss, the government argued the Contract *is* a cooperative agreement.  *See* Def.'s MTD at 11 ("The Agreement Is Also Not Money-Mandating Because It Is A Cooperative Agreement.").  During oral argument, however, government counsel clarified it is not asserting the contract is a cooperative agreement per se, rather this is a "cooperative agreement type situation."  Tr. at 59:15–60:11, 57:16–17.

[7] "An executive agency shall use a cooperative agreement as the legal instrument reflecting a relationship between the United States Government and a State, a local government, or other recipient when—(1) the principal purpose of the relationship is to transfer a thing of value to the State, local government, or other recipient to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government . . . ."  31 U.S.C. § 6305(1).

[8] According to 10 C.F.R. §600.202, the word *grant* means "an award of financial assistance, including cooperative agreements, in the form of money, or property in lieu of money, by the Federal Government to an eligible grantee."  Federal regulations governing cooperative agreements:  require prospective applicants to complete a prescribed form; limit the use of funds provided by the government; require recipients to submit to audits; and vest title to property acquired under the agreement in recipients.  10 C.F.R. §§ 600.210, 600.222, 600.226, 600.231.

The government argues in reply it never stated the Department of Energy regulations regarding cooperative agreements apply and never denied there was offer, acceptance, mutual intent, and an authorized government representative, rather it "established that the nature of the rights negotiated and agreed to by the parties confirms that the parties did not intend for monetary damages to be available if the project fails to produce power for a period of time for any of an expansive list of reasons." Def.'s Reply at 3. The government distinguishes *Anchorage* by arguing the Contract "does not simply fail to explicitly provide for 'monetary remedy upon breach' but rather *explicitly disavows monetary remedy and provides an alternative remedy*" and the benefit received by the government "is significantly different from any 'benefit' that would be realized here." *Id.* at 3–4 (citing *Hymas v. United States*, 810 F.3d 1312, 1328 (Fed. Cir. 2016)). The government further argues the Project "exists *only* for the provision of power *to plaintiff . . . .*" *Id.* at 4. Finally, the government argues "[d]ue to the significant maintenance and upgrades required to keep an aging power plant online, any 'benefit' of owning title to a fifty-year old power plant at the conclusion at [sic] the agreement is, at best, *de minimis*." *Id.* at 5.

## 2.  Availability of Damages Under the Language of the Contract

The government further argues the Court lacks subject-matter jurisdiction because the Contract "explicitly provides that damages are not available to [Sam Rayburn] for the conduct alleged, and instead contemplates an alternative remedy for breach." Def.'s MTD at 6. The government argues the failure to provide power for any reason is not a breach under the explicit language of the Contract. *Id.* at 9 (quoting Contract at 15) ("such interruptions or reductions in service, as hereinbefore set forth, *shall not constitute a breach of this Contract, and neither party shall be liable to the other for damages resulting therefrom*").

The government further argues because the Contract "granted the right to seek 'all other remedies'—in the limited situation where [Sam Rayburn] fails to pay agreed-to fees—to only the [g]overnment . . . damages are not otherwise recoverable" under the Contract. *Id.* at 10 (quoting Contract at 11). Finally, the government argues the Contract's "Termination for Breach" provision constitutes an "alternate remedy." *Id.* (citing Contract at 20). The government argues, "[t]his provision establishes that the parties bargained and agreed to a remedy other than that now sought by [Sam Rayburn]." *Id.* The government analogizes to the Federal Circuit's *Higbie* decision, which the government characterizes as holding "the provision of an alternative remedy for breach of the confidentially [sic] provision defeated the presumption that damages were available." *Id.* at 10–11 (citing *Higbie*, 778 F.3d at 994).

In response, plaintiff argues the Contract does not "expressly disavow[] [Sam Rayburn's] presumptive entitlement to money damages." Pl.'s Resp. at 2. Plaintiff argues the language the government cites for exempting the government from liability for any failure to provide power "insulates the government from having to pay money damages *only* with respect to 'interruptions or curtailments in delivery' resulting from the designated causes." *Id.* at 16. Plaintiff explains it does not request damages for an interruption or curtailment due to any of the designated causes and thus damages are not expressly disavowed for its claim. *Id.*

Plaintiff then argues the provision "guarantee[ing] the government's right to seek legal or equitable relief . . . when [Sam Rayburn] fails to pay agreed-to fees . . . says nothing about [Sam Rayburn]'s right to money damages due to the government's breach of the [Contract] and certainly does not 'expressly' disavow that presumptive right." *Id.* at 17. Finally, plaintiff argues the government's preceding argument regarding its ability to seek legal or equitable relief contradicts its argument that termination is the sole alternative remedy available under the Contract. Pl.'s Resp. at 18. Plaintiff then argues this provision does not prevent Sam Rayburn from seeking damages but rather provides an "*additional* legal remedy to its presumptive entitlement to money damages, and does not 'express[ly] disavow[]' such entitlement." *Id.* Plaintiff distinguishes *Higbie* on the basis the agreement in that case was a "mediation agreement" as opposed to an "ordinary contract." *Id.* at 18–19.

In reply, the government argues "the breadth of circumstances considered to be 'Uncontrollable Forces' . . . indicate that the parties contemplated significant, long-term interruptions to the production of power as circumstances that would not entitle plaintiff to money damages for breach." Def.'s Reply 6 (citing Contract at 4). The government then argues plaintiff "fails to articulate a legal or factual theory under which the outages are due to a circumstance beyond those covered by the expansive prohibition on damages." *Id.* at 7. Finally, the government argues "the Federal Circuit did not limit its ruling to mediation agreements like the one at issue in *Higbie*, but rather applied its own legal precedent to the specific facts at issue, as any appellate court does." *Id.* at 8–9 (citing *Higbie*, 778 F.3d at 993). The government argues *Higbie* "applies here not because of factual similarities between the two matters, but rather because the agreement in *Higbie* was silent as to damages yet deemed not to contemplate them because it offered a non-monetary remedy, and here the agreement *explicitly disallows* damages *as well as* providing an alternative remedy." *Id.* at 9.

## B.  Facial Plausibility

The government argues the first count of plaintiff's amended complaint, alleging breach by failure to deliver any power or energy, "fails to state a claim upon which relief may be granted, and should be dismissed" under RCFC 12(b)(6) because the Contract "does not mandate the provision of any quantity of power . . . ." Def.'s MTD at 15. The government cites the Continuity of Service provision of the Contract as support for this premise:

> Hydro Power and Energy shall be delivered by [SWPA] as scheduled except for interruptions or curtailments in delivery caused by an Uncontrollable Force, or by the operation of devices installed for system protection, or by the necessary installation, maintenance, repair, and replacement of equipment. Such interruptions or reductions in service, as hereinbefore set forth, *shall not constitute a breach of this Contract, and neither party shall be liable to the other for damages resulting therefrom*.

*Id.* (quoting Contract at 15 (Art. V, Sec. 10)). The government argues this language "does not mandate provision of *any* power, and indeed explicitly contemplates that the provision of power may not always be possible, and that such failure would *not* be considered a breach of the agreement . . . ." *Id.* at 14–15.

In response, plaintiff argues the language cited by the government "implies that *other* failures to deliver—such as [SWPA]'s alleged failure to provide any power or energy to [Sam Rayburn] for 41 months—*do* constitute a breach" of the Contract.  Pl.'s Resp. at 22.  Plaintiff also argues this provision "*does* mandate the delivery of power '*except for*' interruptions or curtailments in delivery caused by *force majeure* or the other designated causes which are not the subject of Count One of the Amended Complaint," emphasizing the first phrase of the provision: "Hydro Power and Energy shall be delivered by [SWPA] as scheduled except for . . . ."  *Id.* at 3 (emphasis omitted).  Thus, plaintiff argues "this language does not render [its] claim in Count One implausible or insufficient to be cognizable."  *Id.* at 22.

In reply, the government argues the Contract "places no limitation on the duration of an 'uncontrollable force'" and emphasizes the presence of exceptions in the Contract not related to *force majeure*, such as "necessary installation, maintenance, repair, and replacement of equipment" and "the operation of devices installed for system protection."  Def.'s Reply at 10–11 (quoting Contract at 4, 15) (emphasis omitted).  The government further argues "it is hard to imagine an outage *not* caused by either an 'uncontrollable force,' the 'operation of devices installed for system protection,' or the 'installation, maintenance, repair, and replacement of equipment'—and, importantly, plaintiff has not alleged one in its complaint."  *Id.* (citing *Iqbal*, 556 U.S. at 680–81).

### C. Supplemental Briefing

In its supplemental brief, the government argues the Federal Circuit's decision in *Boaz* "only confirms the legal principles upon which the Government's motion to dismiss this case relies:  the general presumption that monetary damages are available can be defeated by explicit language disavowing that remedy."  Def.'s Suppl. Br. at 2.  The government argues while the Federal Circuit confirmed in *Boaz* that "for claims founded upon a contract, 'there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement,'" the Federal Circuit also "reaffirmed that the presumption of the availability of money damages can be defeated in the case of 'contracts that expressly disavow money damages.'"  *Id.* (quoting *Boaz*, 994 F.3d at 1363, 1365 (internal citations omitted)).

The government also argues the "Availability of Funds to SWPA" section of the Contract "has no bearing on the availability of monetary damages in this instance," and "[t]o the extent the plaintiff interprets this clause to provide for monetary damages *except* when appropriated funds are unavailable, the [g]overnment reasserts its legal position that the allegations of the amended complaint fall within the 'Continuity of Service' clause, the language of which explicitly bars damages in these circumstances."  *Id.* at 3–4 (citing Contract at 19 (Art. VII, Sec. 5)).

In its supplemental brief, plaintiff argues *Boaz* reaffirms the principle that "for claims founded upon a contract, 'there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement,'" and "[t]his presumption normally satisfies the money-mandating requirement for Tucker Act jurisdiction, 'with no further inquiry being necessary.'"  *Boaz*, 994 F.3d at 1364 (quoting *Holmes*, 657 F.3d at 1314) (internal citations

omitted).  Plaintiff reiterated its argument that Article V, Section 10 of the Contract does not expressly disavow money damages but disavows money damages "only for a narrow band of 'interruptions or reductions in service' caused by 'an Uncontrollable Force, or by the operation of devices installed for system protection, or by the necessary installation, maintenance, repair, and replacement of equipment.'"  Pl.'s Suppl. Br. at 2 (quoting Contract at 15).  According to plaintiff, its allegations do not fit in this narrow band of exempted interruptions or reductions in service.  *Id.* at 3.  Plaintiff also argued the Contract is not properly categorized in any of the three categories of contracts the Federal Circuit recognized in *Boaz* as exempt from the presumption damages are available upon a breach of contract.  *Id.* (citing *Boaz*, 994 F.3d at 1370).

Regarding Article VII, Section 5 of the Contract, plaintiff argued the provision suggests the Contract contemplates money damages for a breach of contract because there would be no need for this exemption otherwise.  *Id.* at 4.  "[I]f the government were right," plaintiff argued, "[SWPA] could *never* be held liable in money damages for breach of the [Contract], regardless of whether the breach were [sic] caused by Congress' failure to appropriate needed funds."  *Id.*

## IV.  The Government's RCFC 12(b)(1) Motion Plaintiff's Complaint Should be Dismissed Because the Agreement is Not Money-Mandating

To survive a 12(b)(1) motion to dismiss, plaintiff must prove a substantive source of law which can be fairly interpreted as contemplating money damages.  *Hamlet*, 63 F.3d at 1101.  If the Contract can be fairly interpreted as contemplating money damages, as plaintiff contends, then this Court has jurisdiction under the Tucker Act.  A court deciding a RCFC 12(b)(1) motion to dismiss, "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff," thus the Court's interpretation of the Contract in this Opinion and Order is limited to the government's motion to dismiss and determining the Court's jurisdiction.  *Acevedo*, 824 F.3d at 1368 (citing *Trusted Integration*, 659 F.3d at 1163); *see also Anchorage*, 119 Fed. Cl. at 712–14 (holding two agreements could "fairly be interpreted as contemplating money damages, thus giving the Court jurisdiction under the Tucker Act.").

### A.  Whether a Presumption of Money Damages Applies to the Contract

The government argues the Contract "does not provide for money damages—indeed, it explicitly contemplates that none are available to [Sam Rayburn]—and instead provides [Sam Rayburn] with an alternative remedy for breach."  Def.'s MTD at 8–9.  The government refers to Article V, Section 10 of the Contract, titled "Continuity of Service," which requires SWPA to provide electric power except for "interruptions or curtailments in delivery" caused by:  (1) "Uncontrollable Force," (2) "the operation of devices installed for system protection," or (3) "the necessary installation, maintenance, repair, and replacement of equipment."  Contract at 15. Referring to these exceptions, the Contract provides "[s]uch interruptions or reductions in service . . . *shall not constitute a breach of this Contract, and neither party shall be liable to the other for damages resulting therefrom*."  *Id*. (emphasis added).  During oral argument, the government was "not able to locate" any case holding a contract with similar terms expressly disavowed money damages.  Tr. at 56:3–12.  The government argues the Continuity of Service provision, plus the parties' rights to unilaterally terminate the Contract in the event of a material

breach, suggests the Contract explicitly disallows monetary damages and therefore is not "money mandating."  Def.'s MTD at 1.

Plaintiff alleges a valid contract by proving "offer, acceptance, consideration, and the signature of an authorized government official" and notes "the presumption that money damages are available satisfies the Tucker Act's money-mandating requirement."  Pl.'s Resp. at 1 (quoting *Higbie*, 778 F.3d at 993).  Plaintiff also argues within the provisions the government cites to demonstrate the contract is not money-mandating, "[n]othing . . . expressly disavows [plaintiff's] presumptive entitlement to money damages" when the government fails to perform.  Pl.'s Resp. at 2.  Rather, plaintiff observes the provisions the government cites instead serve to:  (1) "insulate [the government] from liability for money damages for temporary interruptions or curtailments in service caused by a *force majeure* or necessary repairs;" (2) "authorize [the government] to discontinue service and avail itself of any legal or equitable remedy to collect rate payments if [Sam Rayburn] fails to pay . . . for 90 days;" and (3) "allow each party to terminate the [Contract] if the other breaches a material provision."  *Id.*  Plaintiff also argues Article VII, Section 6(b)—which exempts the government from liability for breach in the event Congress fails to appropriate funds to carry out its obligations—only has meaning if the parties intended for money damages to be the default remedy.  Pl.'s Suppl. Br. at 4.

When considering a 12(b)(1) motion to dismiss in a breach of contract case, "there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement."  *Boaz*, 994 F.3d at 1364 (quoting *Holmes*, 657 F.3d at 1314) (holding the court had subject matter jurisdiction over Housing and Urban Development annual contributions contracts because contracts contemplated money damages).  "This presumption normally satisfies the money-mandating requirement for Tucker Act jurisdiction, 'with no further inquiry being necessary.'"  *Id.* (quoting *Holmes*, 657 F.3d at 1314).  The Federal Circuit, however, has "recognized that three types of contracts are exempt from the presumption that damages are available upon the breach of a contract:  (1) contracts that expressly disavow money damages, *Holmes*, 657 F.3d at 1314; (2) agreements that are entirely concerned with the conduct of parties in a criminal case and that lack 'an unmistakable promise to subject the United States to monetary liability,' *Sanders*, 252 F.3d at 1334, 1336; and (3) cost-sharing agreements with the government, *Rick's Mushroom*, 521 F.3d at 1343."  *Boaz*, 994 F.3d at 1365.  A "fair-inference inquiry" is required in cases where "relief for breach of contract could be entirely non-monetary."  *Id.* (quoting *Higbie*, 778 F.3d at 993).  The inquiry requires "a demonstration that 'the agreement[] could fairly be interpreted as contemplating monetary damages in the event of breach," *Id.* (quoting *Higbie*, 778 F.3d at 993), and "is informed by the fact that contracts normally do not contain provisions specifying the basis for the award of damages in case of breach," *Boaz*, 994 F.3d at 1365 (citing *Holmes*, 657 F.3d at 1314).

"Contract interpretation begins with the language of the written agreement."  *NOAA Md., LLC v. Adm'r of Gen. Servs. Admin.*, 997 F.3d 1159, 1165 (Fed. Cir. 2021) (quoting *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004)).  If the terms of the Contract "are clear and unambiguous, they must be given their plain and ordinary meaning."  *Bell/Heery*, 739 F.3d at 1331 (quoting *McAbee Const., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996).  The Continuity of Service provision of the Contract reads in relevant part:

> Hydro Power and Energy shall be delivered by SWPA as scheduled except for interruptions or curtailments in delivery caused by an Uncontrollable Force, or by the operation of devices installed for system protection, or by the necessary installation, maintenance, repair, and replacement of equipment.   Such interruptions or reductions in service, as hereinbefore set forth, shall not constitute a breach of this Contract, and neither party shall be liable to the other for damages resulting therefrom.

Contract at 15 (Art. V, Sec. 10).  The Court starts with a presumption the default remedy for breach of contract is money damages.  *Boaz*, 994 F.3d at 1364.  In this case, the Contract requires SWPA to deliver hydro power and energy as scheduled, with three enumerated exceptions for service interruptions caused by (1) "Uncontrollable Force," (2) "operation of devices installed for system protection," or (3) "necessary installation, maintenance, repair, and replacement of equipment."  Contract at 15 (Art. V, Sec. 10).  The plain language of the provision states "[s]uch interruptions or reductions in service . . . *shall not constitute a breach* of this Contract."  *Id.* (emphasis added); *see also Bell/Heery*, 739 F.3d at 1331.   While this provision plainly defines what "shall not constitute breach of this Contract," it does not plainly foreclose damages from potential breaches outside these three enumerated exceptions for service interruptions.  Contract at 15 (Art. V, Sec. 10); *see also Bell/Heery*, 739 F.3d at 1331.

During oral argument, the Court asked the parties to provide "a category or some categories of interruption that fall outside [the Continuity of Service enumerated exceptions]," to which plaintiff responded, "[t]here's . . . nine examples . . . alleged in Paragraph 29 of our complaint . . . . None of these qualifies for the exception clause."  Tr. at 83:1–25 (citing Am. Compl. at 10–11).  Plaintiff is applying the negative implication canon, a tool of contract interpretation this court has employed many times.  *See, e.g.*, *Pub. Util. Dist. No. 1 v. United States*, 20 Cl. Ct. 696, 700 (1990) (interpreting a contract using the doctrine of *expressio unius est exclusion alterius*); *United Pac. Ins. v. United States*, 497 F.2d 1402, 1405 (Ct. Cl. 1974) (applying the rule of *expressio unius est exclusio alterius* to find when language specifically provided where flashings were to be installed, there was manifested an intention the flashings are not required to be installed elsewhere); *Nicholson v. United States*, 29 Fed. Cl. 180, 196 (1993) (explaining where particular things are specified in a contract, others of the same general character are impliedly excluded); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107–11 (2012) (describing the negative implication canon as "[t]he expression of one thing implies the exclusion of others").  The government also argues the negative implication canon is "a basic tenet of contract construction" as "when a right is specifically carved out for one party and not for another, that indicates that the parties considered that and that they did not intentionally extend that right to another party."  Tr. at 26:18–22.  By enumerating three specific categories of service interruptions as nonbreaching events for which neither party is liable to the other in damages, the parties implied non-enumerated service interruptions could constitute a breach for which damages would be available.  *See, e.g.*, *Pub. Util. Dist. No. 1*, 20 Cl. Ct. at 700.  At oral argument, the government agreed the enumerated list in the Continuity of Service provision could imply the government should be liable for money damages for service interruptions outside the listed exceptions.  Tr. at 30:5–22 ("COURT:  . . . [Article V, Section 10] seems to clearly say that any failure to deliver power outside the exceptions listed would constitute breach of contract and that the implication would be that such

a breach outside of the exceptions could lead to liability for damages.  Does it not?
[GOVERNMENT]:  Yes, Your Honor.  I think that . . . is a way that this contract could be
read.").  For subject-matter jurisdiction analysis, therefore, the Continuity of Service provision
does not disavow damages in the event of a breach.  *Bell/Heery*, 739 F.3d at 1331; *see also
Hamlet*, 63 F.3d at 1101.

 Further, no express language in the Contract indicates the parties did not intend for
money damages to be available in the event of breach.  Tr. at 57:1–5 ("COURT:  . . . the
Government agrees that there is no express sentence that disavows money damages.
[GOVERNMENT]:  Yes, Your Honor, we would agree.").  This fact weighs in favor of finding
the parties intended for money damages to be available in the event of breach.  *Holmes*, 657 F.3d
at 1316 (explaining absence of express disavowal of money damages suggested money damages
were available).  For jurisdictional analysis, the Contract can reasonably be interpreted to require
money damages so long as plaintiff's claim does not fall within the Continuity of Service
provision's three enumerated exceptions.  *See Boaz*, 994 F.3d at 1364–65.  This conclusion is
also consistent with, and supported by, other terms of the Contract.

 If Sam Rayburn fails to pay any amount due under the Contract, SWPA may discontinue
service and "the rights granted SWPA herein shall be in addition to *all other remedies available
to SWPA, either at law or in equity*, for the breach of any of the provisions of this Contract."
Contract at 11 (Art. IV, Sec. 2(d)) (emphasis added).  When asked whether this term is consistent
with the default assumption the Contract includes a damages remedy for breach, the government
conceded "it could certainly be read that way . . . ."  Tr. at 26:4–16.  Further, it would be
unnecessary to exempt SWPA from liability in the event Congress fails to appropriate funds as
provided by Article VII, Section 5 if the Contract does not contemplate money damages.
Contract at 19.

 The Contract requires the parties to take "appropriate corrective or remedial action" in
the event electric service does not "meet accepted standards of reliability and adequacy."
Contract at 15 (Art. V, Sec. 9).  A consistent reading of the Contract requires the term *remedies*
as used in Article IV, Section 2(d) and *remedial action* in Article V, Section 9 (which uses the
adjectival form of *remedy*) to be given a consistent meaning.  *United Int'l Investigative Servs. v.
United States*, 109 F.3d 734, 737 (Fed. Cir. 1997) (quoting *Granite Constr. Co. v. United States*,
962 F.2d 998, 1003 (Fed. Cir. 1992) (holding a contract must be interpreted "in a manner which
gives reasonable meaning to all its parts and avoids conflicts or surplusage of its provisions.");
*see also Remedy, Black's Law Dictionary* (11th ed. 2019) ("[t]he means of enforcing a right or
preventing or redressing a wrong; legal or equitable relief.").  The government argues, *corrective*
and *remedial* both "refer to fixing the plant."  Tr. at 29:3–6.  Plaintiff counters with a non-
frivolous argument that avoids surplusage by assigning different meanings to *corrective* and
*remedy*:  "Corrective action would be fixing the plant . . . . Remedial action, a remedy, includes
the remedy of money damages . . . ."  Tr. at 29:14–17; *see also United Int'l Investigative Servs.*,
109 F.3d at 737.

 To survive a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, plaintiff
need only plead "a non-frivolous claim based on a money-mandating source of law" which
source can be "an express contract with [the government]."  *Boaz*, 994 F.3d at 1370 (citing

*Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997)). The Court accordingly applies the presumption of money damages, at least for 12(b)(1) purposes, as plaintiff sufficiently pled a "non-frivolous claim" based "on a money-mandating" contract with the government.  *See Boaz*, 994 F.3d at 1370.

### B.  The Government Argues the Contract is Not Money-Mandating Because it Contemplates an Alternate Remedy

The government also argues the Contract is not money-mandating because it provides an alternate remedy in place of money damages:  unilateral termination upon thirty day's written notice.  Def.'s MTD at 10; Tr. at 9:14–19, 20:14–22; Contract at 20 (Art. VII, Sec. 6). According to the government, the presence of an alternate remedy in a contract defeats the money damages presumption.  Def.'s MTD at 10–11.  The government cites the Federal Circuit's decision in *Higbie* as support for their argument, though it acknowledges *Higbie* is factually distinct from the present case.  Tr. at 48:1–4 ("[Government]: . . . [the agreement in *Higbie*] obviously was a different sort of agreement.").

In *Higbie*, the government entered into a mediation agreement with Mr. Higbie in which the confidentiality provision read, the "statements made during the mediation are for settlement purposes only."  *Higbie*, 778 F.3d at 992.  Employees for the government later gave affidavits to an equal employment opportunity investigator disclosing statements made during mediation by Mr. Higbie.  *Id.*  The Federal Circuit held the mediation agreement was not money-mandating because the agreement itself provided a remedy by restricting statements made during mediation to "settlement purposes *only*."  *Id.* at 994.  The Federal Circuit in *Higbie* also found the agreement did not contain any provision expressly contemplating money damages.  *Id.*  The Contract in this case, however, includes such terms.  Contract at 15 (Art. V, Sec. 9) ("If questions are raised concerning the quality of service . . . corrective or *remedial action* shall be promptly taken by the party at fault.") (emphasis added); Contract at 19 (Art. VII, Sec. 5) (stating in the event Congress fails to appropriate funds for SWPA to carry out its obligations under the Contract, Sam Rayburn "hereby releases SWPA from any and all liability for failure to perform and fulfill its obligations under this Contract for that reason.").

The Federal Circuit's reasoning in *Higbie* is instructive.  The Federal Circuit reviewed the remedy available to Mr. Higbie—restricting use of his statements to settlement purposes only—for its appropriateness.  *Higbie*, 778 F.3d at 994.  The purpose of a breach of contract remedy is to restore the nonbreaching party to the position it would have enjoyed had the breaching party fully performed.  *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005) (citing *San Carlos Irr. & Drainage Dist. v. United States*, 111 F.3d 1557, 1563 (Fed. Cir. 1997) ("[t]he remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed."). The remedy in *Higbie* was appropriate because it eliminated the prejudicial effect of the employees' unauthorized disclosure in other proceedings.  *Higbie*, 778 F.3d at 994.

Here, the government suggests the Contract's unilateral termination provision is a remedy, but the Contract does not use this word to describe the provision.  *See* Contract at 20 (Art. VII, Sec. 6) ("[i]f either party hereto breaches a material provision of this Contract . . . the

other party, at its option, may terminate this Contract . . . .").  Under the government's interpretation of the Contract, if SWPA refused to deliver power immediately after the plant became operational, Sam Rayburn's only remedy would be to terminate the Contract.[9]  Tr. at 61:4–11, 76:16–77:12.  Sam Rayburn could escape further performance by terminating the Contract—but termination would not restore Sam Rayburn to the position it would have been in had the government fully performed.  The Contract's unilateral termination clause, therefore, can reasonably be distinguished from the remedy in *Higbie* because the termination clause does not appropriately restore the nonbreaching party to the position it would have been in absent the other party's breach.  *Higbie*, 778 F.3d at 994.

Further, the Contract itself can be reasonably interpreted to suggest a party can be liable for breach even after termination.  Contract at 20 (Art. VII, Sec. 6).  The Contract provides an exemption from liability after a breach in the event either party is prevented from fulfilling its obligation by reason of an Uncontrollable Force.  *Id.* ("Neither party hereto, however, shall be considered to be in default or breach with respect to any obligation under this Contract if prevented from fulfilling such obligation by reason of an Uncontrollable Force.").  By negative implication, this term reasonably suggests the parties could be liable for breach resulting from non-Uncontrollable Forces after the Contract has been terminated.  *See, e.g.*, *United Pac. Ins.*, 497 F.2d at 1405 (applying negative implication canon for contract interpretation).  To say the Contract does not allow money damages for breach after termination would render this term meaningless, and the Court is obliged to interpret the Contract in a sensible manner that gives meaning to each provision.  *NOAA Maryland*, 997 F.3d at 1166 (quoting *Langkamp v. United States*, 943 F.3d 1346, 1353 (Fed. Cir. 2019)) ("[w]e must interpret a contract 'in a manner that gives meaning to all of its provisions and makes sense.'").

### C.  The Government's Arguments Concerning Exceptions in the Continuity of Service Provision

In its original motion, the government argued the Contract expressly disavows money damages, Def.'s MTD at 11, but when asked to identify language in the Contract expressly disavowing money damages, the government conceded there was none.  Tr. at 57:1–5 ("COURT: . . . [T]he government agrees that there is no express sentence that disavows money damages.  [GOVERNMENT]:  Yes, Your Honor, we would agree.").  Instead, the government argues the conduct falls within the three exceptions provided in the Contract's Continuity of Service provision.  Tr. at 62:10–15.  When pressed further, the government recognized the pleading does not claim the service interruptions in this case were due to an Uncontrollable Force.  Tr. at 65:1–12, 79:19–80:3.  Instead, the government argues plaintiff's claim does not address "any of that other language under the continuity of service clause."  Tr. at 65:1–12.  The government reasons "[w]e believe that . . . language is broad enough that at the very least [p]laintiff should be

---

[9] "COURT:  So is it the [g]overnment's position then that similar to the ADR provision in *Higbie* there's a provision in this contract that supplants money damages?  [GOVERNMENT]:  Yes, Your Honor.  It's our position that the termination for breach on page 20 of the [C]ontract is the alternative remedy that the parties agreed to in lieu of money damages."  Tr. at 61:4–11.  "COURT:  . . . is it the [g]overnment's position that it's impossible for the government to breach the contract since the [g]overnment believes the [C]ontract never requires the [g]overnment to provide power?  [GOVERNMENT]:  No, Your Honor, that is certainly not the case.  If anything, the termination clause contemplates that there could be a material breach by either party and gives the other party the right to terminate there."  Tr. at 76:16–25.

required to specifically plead which claims it's bringing and how it is outside of that express disavowal of damages that the parties agreed to in that clause." *Id*.

Plaintiff's amended complaint lists several technical problems with the plant—including broken, outdated, faulty, and worn equipment—and alleges these problems resulted in reductions in service sufficient to reduce "availability of the [generators] during the period 2012 to 2017 [to] less than 25%." Am. Compl. at 11; *see Acevedo*, 824 F.3d at 1368 (citing *Trusted Integration*, 659 F.3d at 1163). The government admits: "there are currently significant operational problems with the plant," Tr. at 15:3–5; "at the time that this complaint was filed, the plant was not producing energy due to repairs that had to be made," Tr. at 16:5–11; and the government does not dispute plaintiff's assertion that "[t]he last [power] production [before oral argument] . . . . [Was] less than 1 percent of [the plant's] capacity, Tr. at 16:12–23. The government further acknowledges serious issues after a transformer was wrecked by a raccoon.[10] Tr. at 33:1–13. Although the government does not dispute the plant's poor condition, Tr. at 15:3–5, it admits the reason repairs have been delayed "is a factual dispute between the parties."[11] Tr. at 20:24–21:11.

According to plaintiff, these technical problems caused service interruptions "during the 17-month period from December 2015 through April 2017 and during the 20-month period from January 2019 through August 2020." Am. Compl. at 13. "In determining jurisdiction, a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Acevedo*, 824 F.3d at 1368 (citing *Trusted Integration*, 659 F.3d at 1163). The Court thus accepts plaintiff's allegations regarding the plant's condition as true for jurisdiction analysis. *Id*.

The government argues interruptions due to these technical problems are exempt from damages liability under the Contract's Continuity of Service provision; specifically, the exception for interruptions due to "the necessary installation, maintenance, repair, and replacement of equipment." Tr. 84:6–12; Contract 15 (Art. V, Sec. 10). The question, therefore, is whether plaintiff alleges a breach caused by a condition the Contract exempts from damages liability. *Boaz*, 994 F.3d at 1365.

The government recognizes the pleading does not claim the service interruptions in this case were due to an Uncontrollable Force.[12] Tr. at 65:1–12, 79:19–80:3. The Contract exempts

---

[10] At oral argument, counsel for the government explained: "[w]ith regard to the transformer, if it's the transformer I'm thinking of, I believe the issue was actually—it sounds like there was a raccoon that got over a fence and onto the transformer, and the transformer exploded somehow. And that was—that is a major issue for a power plant. There's only two transformers. It really impacts operations." Tr. at 33:7–13.

[11] According to the government, plaintiff requested the government delay making repairs pending a decision on decommissioning the plant. Tr. at 20:24–21:11 ("COURT: . . . is there anything that is preventing the repairs from being started? [GOVERNMENT]: Again, it sounds like there is a factual dispute between the parties. My understanding from talking to the agencies is that this is an ongoing process with Sam Rayburn and that there has been a request to pause and see what can be done, whether or not it . . . makes sense to repair the plant. . . . I see obviously there is a disagreement between the parties as to the status of that . . . .").

[12] Plaintiff expressly states the failure in service was not caused by an Uncontrolled Force. Am. Compl. at 10–11. The Contract defines Uncontrollable Force as "any force which is not within the control of the party affected . . . which by exercise of due diligence and foresight such party could not reasonably have been expected to avoid."

failures in service when caused by "the operation of devices installed for system protection." Contract at 15 (Art. V, Sec. 10). Plaintiff alleges the failure in service was caused, not by any device's *operation*, but by the *failure* of certain necessary equipment. Am. Compl. at 10–11. For jurisdiction analysis purposes, the facts plaintiff alleges do not suggest the operation of any device installed for system protection, therefore the Contract's exemption from liability based on the operation of devices installed for system protection does not apply. *Acevedo*, 824 F.3d at 1368 (citing *Trusted Integration*, 659 F.3d at 1163).

As for the government's argument concerning the third exception, the Continuity of Service provision reads: "Hydro Power and Energy shall be delivered by SWPA as scheduled except for interruptions or curtailments in delivery caused by . . . the necessary installation, maintenance, repair, and replacement of equipment." Contract at 15 (Art. V, Sec. 10). The plain language of the Contract exempts the government from liability for interruptions in service due to the necessary installation, maintenance, repair, and replacement of equipment. *Id.* Plaintiff, however, has not alleged these conditions caused the interruptions—plaintiff alleges faulty equipment (e.g., a failed station service transformer) caused the interruptions. Am. Compl. at 10–11. According to plaintiff, interruptions in service were the result of the equipment's "total failure"—not the government's installing, maintaining, repairing, or replacing of equipment. Tr. at 35:9–16.

---

Contract at 4 (Art. I, Sec. 5). The definition lists examples of Uncontrollable Forces, including: "failure of water supply, failure of facilities, flood, earthquake, storm, lightning, fire, epidemic, war, riot, civil disturbance, labor disturbance, sabotage, or restraint by court of general jurisdiction." *Id.* A reasonable inference can be drawn from the technical problems plaintiff alleges that the failure in service could have reasonably been avoided if SWPA had exercised due diligence and foresight; thus, the exemption from liability for reason of being an Uncontrollable Force does not apply. *Acevedo*, 824 F.3d at 1368 (citing *Trusted Integration*, 659 F.3d at 1163).

The government also theorized the poor condition of the plant falls under the definition of an Uncontrollable Force because it falls under "failure of facilities." Tr. at 37:10–19. However, the term *facilities* as used in the Contract could reasonably be interpreted as referring to equipment used to transmit power, not produce it. Contract at 2 ("WHEREAS, *transmission facilities* of the United States are not available for the delivery, by SWPA to [Sam Rayburn], of the electric power and energy purchased by [Sam Rayburn] under this Contract . . .") (emphasis added); Contract at 3 (". . . hydroelectric power and energy purchased by [Sam Rayburn] from SWPA under this Contract will be *received* by Gulf States for the account of [Sam Rayburn] *from the facilities* of the United States . . .") (emphasis added); Contract at 3 ("The term 'System of Sam Rayburn' as used herein, shall mean the *transmission and related facilities* of [Sam Rayburn]") (emphasis added); Contract at 8 ("It is recognized that power and energy purchased under this Contract will be delivered from the System of SWPA into the *transmission and related facilities* of an entity not party to his Contract . . .") (emphasis added); Contract at 11–12 ("Section 1. *Facilities to be Furnished by SWPA and [Sam Rayburn]*. SWPA and [Sam Rayburn] shall furnish, install, maintain, and operate . . . such facilities and equipment, including metering equipment, as may be necessary to fulfill their respective obligations under this Contract and to assure reasonable protection to the facilities of others.") (emphasis added); *but see* Contract at 3 ("The term 'System of SWPA,' as used herein, shall mean the *generation, transmission, and related facilities* of the United States Government . . .") (emphasis added); Contract at 17 ("It is recognized by the parties hereto that the sale and delivery of Hydro Power and Energy under this Contract is conditioned and contingent upon the construction of hydropower generating *facilities* at the Town Bluff Dam pursuant to the [Construction Agreement] . . ."). Even if the service interruptions can be attributed to *failure of facilities*, the definition of Uncontrollable Force also requires the condition be outside SWPA's control. Contract at 4 (Art. I, Sec. 5). A reasonable inference can be drawn from the problems identified by plaintiff that service interruptions related to faulty equipment were within SWPA's control to prevent.

The Court interprets the Continuity of Service provision by studying the meaning of its plain language. *NOAA Maryland*, 997 F.3d at 1165–66 (citations omitted). The Court must interpret a contract "in a manner that gives meaning to all [the Contract's] provisions and makes sense." *Id.* at 1166 (quoting *Langkamp*, 943 F.3d at 1353)). In this case, the adjective *necessary* modifies the entire subsequent series of nouns such that each listed condition must be *necessary*.[13] *SIMO Holdings, Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, 983 F.3d 1367, 1377 (Fed. Cir. 2021) (quoting Scalia & Garner, *supra*, at 147). This principle has "particular force when the term joining the items in a series is 'and.'" *Id.* (citing *SuperGuide Corp. v. DirecTV Enters.*, 358 F.3d 870 (Fed. Cir. 2004)). For jurisdiction analysis purposes, the plain language of the Continuity of Service's third category can reasonably be interpreted as only exempting *necessary* interruptions or reductions in service. Contract at 15 (Art. V, Sec. 10).

This meaning is further consistent with a subsequent term in the Continuity of Service provision which says "SWPA shall give [Sam Rayburn] reasonable advance notice of *temporary* interruptions or curtailments in service *necessary* for such installation, maintenance, repair, and replacement of equipment . . . ." *Id.* A reasonable inference can be drawn from plaintiff's list of faulty equipment that SWPA neglected its contractual obligation to maintain the plant,[14] allowing it to fall into disrepair and ultimately fail to produce power. *Acevedo*, 824 F.3d at 1368 (citing *Trusted Integration*, 659 F.3d at 1163). That the alleged interruptions in service endured for such lengthy periods—seventeen and twenty months—further supports a reasonable inference that SWPA unnecessarily delayed repairing or replacing faulty equipment. *Id.* For 12(b)(1) purposes, the Court finds these *unnecessary* interruptions in service are not exempt from money damages under the Continuity of Service provision. *See* Contract at 15 (Art. V, Sec.10); *Acevedo*, 824 F.3d at 1368 (citing *Trusted Integration*, 659 F.3d at 1163).

### D. Whether the Contract Is a Cooperative Agreement that Is Not Money-Mandating

The government argues the Contract is "of a nature that is 'not presumed to provide money damages'" as it is "akin to a cooperative agreement, which serves to 'transfer a thing of value to the State, local government, or other recipient to carry out a public purpose of support or stimulation authorized by a law of the United States.'" Def.'s MTD at 11–12 (first quoting *St. Bernard Par.*, 134 Fed. Cl. at 734; and then quoting 31 U.S.C. § 6305(1)).

According to the government, the Contract is "akin" to a cooperative agreement because its "principal purpose" is to "transfer a thing of value"—namely, all power produced at the

---

[13] A prepositive modifier generally modifies the entire series that follows it if there is a straightforward, parallel construction involving all nouns or verbs in the series. Scalia & Garner, *supra*, at 147–51.

[14] The Contract requires SWPA to "furnish, install, maintain, and operate, or cause to be furnished, installed, maintained, and operated, such facilities and equipment . . . as may be necessary to fulfill [its] obligations under this Contract." Contract at 11–12 (Art. V, Sec. 1). It also requires SWPA to "construct, maintain, and operate [its] transmission and related facilities, or cause [its] transmission and related facilities, to be constructed, maintained, and operated, in accordance with standards at least equal to those provided by the National Electrical Safety Code of the United States Bureau of Standards." *Id.* at 12 (Art. V, Sec. 2). Further, Article V, Section 9 says "[e]lectric service rendered by SWPA under this Contract shall meet accepted standards of reliability and adequacy in the electric utility industry." *Id.* at 15.

plant—to Sam Rayburn.[15]  Def.'s MTD at 12 (quoting 31 U.S.C. § 6305(1)).  The government argues "when an agreement is structured like a cooperative agreement, the presumption that monetary damages are available is rebutted."  Tr. at 25:1–3; *see also* Def.'s MTD at 6.  Although Sam Rayburn pays monthly fees to SWPA, the government argues "those fees are structured so as 'to be isolated project rates' that 'are only intended to recover all operating, maintenance, addition, replacement, marketing, and concomitant interest expenses associated with this Contract.'"  Def.'s MTD at 12 (quoting Contract at 5–6 (Art. II, Sec. 3(a))).  The government continues, "[t]he fees thus serve only to compensate the [g]overnment for some portion of the costs of providing a service to [Sam Rayburn]."  *Id.*  Accordingly, the government argues damages should not be presumed because the Contract does "not provide for the transfer of goods or services to the [g]overnment."  Tr. at 57:14–22.  The government cites *Rick's Mushroom*, 521 F.3d at 1343–44, for support, although it acknowledges this case involves "different circumstances."[16]  Tr. at 59:15–60:11.  The government further argues "the agreement 'car[ries] out a public purpose' . . . by fulfilling the Flood Control Act of 1944."[17]  Def.'s MTD at 12–13 (quoting 31 U.S.C. § 6305(1)).

The general rule that money damages are available as a remedy does not apply to cooperative agreements because they lack a necessary element of contract formation—consideration.  *See St. Bernard Par.*, 134 Fed. Cl. at 736 (holding absence of consideration in cooperative agreement rendered it unenforceable).  In *Rick's Mushroom*, the Federal Circuit held the cost-share agreement at issue did not provide a substantive right to recover money damages because the agreement did not provide for transfer of goods or services to the government, there was no evidence of a buyer-seller relationship, and the government did not receive a direct benefit.  *Rick's Mushroom*, 521 F.3d at 1343–44 (holding also a claim for breach of implied-in-fact contract with the government fails for similar reasons).  All three factors bear on whether there was consideration sufficient to form a binding contract.

In this case, plaintiff alleges, and the government does not dispute the elements of a contract—including consideration—are present, thus for 12(b)(1) purposes, the Court is obliged to find a valid contract.  Tr. at 68:16–20 ("COURT:  . . . So the [g]overnment, to confirm, does not dispute any of the four elements then to create a contract . . . ?  [GOVERNMENT]:  No, the [g]overnment does not.");  *see also Acevedo*, 824 F.3d at 1368.  As previously stated, a valid contract invokes the presumption money damages are available upon breach.  *Boaz*, 994 F.3d at 1365;  *Higbie*, 778 F.3d at 993.  At least for 12(b)(1) purposes, the Contract therefore is distinguishable from the cooperative agreement in *Rick's Mushroom*, 521 F.3d at 1344.

---

[15] Article II, Section 1, of the Contract reads:  "SWPA shall sell and deliver and [Sam Rayburn] shall purchase and receive, or cause to be received, all of the electric power . . . and energy . . . generated at the Project . . . ."  Contract at 4.

[16] Plaintiff distinguishes this case from *Rick's Mushroom* stating *Rick's Mushroom* involved "a gift by the [g]overnment to a private entity . . . . That's not this.  This is a standard contract:  Government, we have built for you a plant; you have title to the plant; now you operate the plant and you produce electricity and [Sam Rayburn] will pay for it."  Tr. at 58:18–25.

[17] The Flood Control Act of 1944 "requires the Department of energy to:  '[T]ransmit and dispose of such power and energy in such manner as to *encourage the most widespread use thereof at the lowest possible rates* to consumers consistent with sound business principles, the rate schedules to become effective upon confirmation and approval by the Secretary of Energy.'"  Def.'s MTD at 12–13 (citing 16 U.S.C. § 825s).

In a comparable case, *Anchorage*, this court found two agreements between the parties were not cooperative agreements and could "fairly be interpreted as contemplating money damages, thus giving the Court jurisdiction under the Tucker Act." *Anchorage v. United States*, 119 Fed. Cl. 709, 712–14 (2015). The agreements tasked the Maritime Administration with certain oversight and financial responsibilities related to a project for expanding the Port of Anchorage. *Id.* at 710–12. The government argued the agreements were cooperative agreements because their purpose "was not for [the Maritime Administration] to purchase or lease anything from Anchorage," but to "work cooperatively" to "benefit the efforts of [Anchorage] in execution of its Port Expansion." *Id.* at 713. This court found the agreements at issue were not cooperative agreements, however, due to their "reciprocal nature." *Id.* As evidence of reciprocity, the court explained Anchorage's payments to the Maritime Administration toward construction of the port and Anchorage's contractual obligation to provide new staging areas in the port for military use. *Id.*

In this case, the parties agreed Sam Rayburn would pay to construct the power plant at issue and pay monthly fees to SWPA. The Contract incorporates a Construction Agreement which, under the heading of "Consideration and Payment," requires Sam Rayburn to fund construction of a power plant which SWPA would own and operate. Contract Ex. 1 at 2–3. The government argues the conveyance of the plant does not benefit the government because the plant can only be used to produce power for Sam Rayburn. Def.'s Reply at 5. The government asserts the Contract "has a term of fifty years" and argues "any 'benefit' of owning title to a fifty-year old power plant at the conclusion [of] the agreement is, at best, *de minimis*." *Id.*

This argument places too much emphasis on the *sufficiency* of the benefit, and too little on whether one *exists*. The Court looks for a government benefit to determine whether the government has received any consideration sufficient to form a contract. *St. Bernard Par.*, 134 Fed. Cl. at 736 (finding the absence of consideration in cooperative agreement rendered it unenforceable). The Federal Circuit explains "it is well-established that 'the law will not inquire into the adequacy of consideration so long as the consideration is otherwise valid to support a promise.'" *SGS-Thomson Microelectronics, Inc. v. Int'l Rectifier Corp.*, 1994 WL 374529, at *5 (Fed. Cir. 1994) (unpublished table decision) (quoting 3 Williston, *Contracts*, § 7:21 (4th ed. 1992)).

Sam Rayburn paid approximately $20 million dollars—one hundred percent—of the construction costs to build the Town Bluff Hydropower Project. Am. Compl. at 8. Beyond paying the full cost of the project, Sam Rayburn also agreed to pay monthly fees to SWPA. Contract at 5 ("[i]n consideration of the benefits to [Sam Rayburn] hereunder, [Sam Rayburn] shall compensate SWPA each month for Hydro Power and Energy purchased under this Contract."). Sam Rayburn states it has paid fees for power as required by the Contract for thirty-one consecutive years. Pl.'s Resp. at 2. The government's assertion the fees only compensate the government for the costs of providing a service is weakened by this court's holding in *Anchorage*, where this court found reciprocity although payments made to the government agency were only used to further the project. *Anchorage*, 119 Fed. Cl. at 713. Sam Rayburn's years of fee payments and its significant investment in constructing the government's power plant support a reasonable inference the nature of the agreement was reciprocal. *Acevedo*, 824 F.3d at 1368. Accepting as true all undisputed facts asserted in plaintiff's complaint and drawing

all reasonable inferences in favor of plaintiff, the Court concludes principles governing cooperative agreements do not apply and the presumption of money damages is available. *Anchorage*, 119 Fed. Cl. at 713; *see also Trusted Integration*, 659 F.3d at 1163.

## V.  The Government's RCFC 12(b)(6) Motion Plaintiff's Complaint Should be Dismissed Because the Contract Does Not Mandate Providing Power

The government argues plaintiff's Count I fails to state a claim pursuant to RCFC 12(b)(6) because the agreement does not provide money damages as a remedy for failing to provide power.  Def.'s Reply at 10.  According to the government, the parties understood it may not always be possible to deliver power, and so the Contract does not require SWPA to provide *any* power.  Def.'s MTD at 14 ("the plain language of the agreement does not mandate provision of *any* power . . . .").  During oral argument, however, the government conceded a breach of contract claim for failing to deliver power could satisfy the requirements of RCFC 12(b)(6) if the Contract were money-mandating and the failure to deliver power were due to a condition not exempted from damages liability.  Tr. at 78:18–79:3.  The government essentially repeats its 12(b)(1) arguments and in this regard strays close to merging a 12(b)(1) inquiry with a 12(b)(6) inquiry.  This Court, however, understands these inquiries are typically distinct.  *See Boaz*, 994 F.3d at 1370.

To survive a motion to dismiss under RCFC 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570.  The Court "must accept as true all of the factual allegations in the complaint" and "must indulge all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted).  A court's 12(b)(1) and 12(b)(6) determinations are "generally distinct." *Boaz*, 994 F.3d at 1370.  For a 12(b)(1) determination "all that is required is a determination that the claim is founded upon a money-mandating source and the plaintiff has made a nonfrivolous allegation that is within the class of plaintiffs entitled to recover under the money-mandating source." *Id.* at 1371 (quoting *Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin.*, 525 F.3d 1299, 1309 (Fed. Cir. 2008).  By contrast, for a 12(b)(6) merits inquiry the court must "consider[] whether the plaintiff has established all *elements* of its cause of action." *Id.* (quoting *Fisher v. United States*, 402 F.3d 1167, 1175 (Fed. Cir. 2005)).

The Contract is money-mandating for RCFC 12(b)(6) purposes as it is for jurisdiction purposes.  *See Fisher*, 402 F.3d at 1173 ("[T]he determination that the source is money-mandating shall be determinative both as to the question of the court's jurisdiction and thereafter as to the question of whether, on the merits, plaintiff has a money-mandating source on which to base his cause of action.").  The Court must next consider whether plaintiff sufficiently established all elements of its cause of action.  *Boaz*, 994 F.3d at 1371.  Plaintiff alleges—and the government does not dispute—the elements of contract formation, thus the Court finds plaintiff established a valid contract.  Tr. at 68:16–20.

"A breach of contract is a failure to perform a contractual duty when it is due." *Trauma Serv. Grp.*, 104 F.3d at 1325.  Article II, Section 1 of the contract provides "SWPA shall sell and deliver and [Sam Rayburn] shall purchase and receive . . . all of the electric power . . . and

energy . . . generated at the Project." Contract at 4. Plaintiff argues the plain language of this provision requires SWPA to *deliver* power to Sam Rayburn but SWPA failed to deliver electric power over two periods for a total of thirty-seven months. Am. Compl. at 13.

Plaintiff alleges at least nine technical problems with the plant caused extended periods of service interruption, including:

> a failed station service transformer; a faulty fixed-mounted emergency diesel generator; unit control system programmable logic controllers whose software did not run on modern operating systems and whose parts were almost impossible to find; increasingly unreliable and worn governors which required non-standard parts because of the unavailability of replacement parts; a [supervisory control and data acquisition] system comprised of equipment of different vintages which had numerous hardware failures; communications equipment near the end of its life which could not be expanded; unit exciters which experienced numerous failures and for which replacement parts were scarce; bushings for the wicket gates which must be replaced and whose seals had failed, allowing water leaks; and bearings that had worn to a point that the governor system had to operate at a level much higher than appropriate.

Am. Compl. at 10–11. These technical problems, according to plaintiff, contributed to service interruptions "during the 17-month period from December 2015 through April 2017 and during the 20-month period from January 2019 through August 2020." Am. Compl. at 13. As discussed in the Court's 12(b)(1) section it can be reasonably inferred the alleged delays were not caused by any exempted condition. *See supra* Part IV. Accepting as true all undisputed facts asserted in plaintiff's complaint and drawing all reasonable inferences in favor of plaintiff, these facts are sufficient to state a claim for breach of contract that is plausible on its face. *Iqbal*, 556 U.S. at 678; *Boaz*, 994 F.3d at 1370–71; *Athey*, 908 F.3d 696 at 705.

## VI. Conclusion

For the foregoing reasons, the Court **GRANTS** plaintiff's motion for leave to file supplemental opposition to the government's motion to dismiss, **DENIES** the government's motion to dismiss pursuant to RCFC 12(b)(1) for lack of subject-matter jurisdiction, and **DENIES** the government's motion to dismiss pursuant to RCFC 12(b)(6) for failure to state a claim upon which relief can be granted. The parties **SHALL FILE** a joint status report on or before **2 November 2021** detailing the next steps to be taken in this case, including the parties' positions on lifting the stay of plaintiff's 19 January 2021 Motion for Partial Summary Judgment.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge